Are we in the right place, Your Honor? Good morning, Your Honors. My name is Larry Gibbs. Along with my co-counsel, Cliff Gardner, we represent the petitioner and appellant, Richard Stewart, in this matter. Your Honor, this case involves conduct by trial counsel that is as baffling as it is stunning. Here's a man who has his client on trial literally for his life. It's a death penalty case, and he fails to put before the jury a statement from a third party which the California Supreme Court characterized as indicating that the third party was the one who was the killer. Now, Your Honor, to be sure, there are a lot of explanations for why that happened. A lot of reasons have been suggested both by the district court and by the state to explain trial counsel's conduct. It's a little bit, though, like that cartoon where the rabbit pops up in a hole and you push him down and he pops up somewhere else. Every time a tactical reason has been suggested to explain Mr. James' conduct in this case, we have controverted it, and then another tactical reason is suggested. Thus far, we have six tactical reasons, none of which really hold any water. We know really from the outset, from the record, that Mr. James himself had no tactical reason not to put Solvang's statements before the jury because after the verdict came in, in his motion for new trial, he is still complaining that the jury never heard from Mr. Solvang. So even after all of the evidence had come in and so on and so forth, he's still concerned that we don't have the jury hasn't heard from Solvang. At any point along the line, did you ever ask for an evidentiary hearing? Yes, Your Honor. It's not on appeal, right? I'm sorry? That issue is not on appeal? The failure to grant an evidentiary hearing? Yes. Your Honor, I think it's — it was not specifically appealed apart from the denial of the writ. But the reason — one of the reasons we say that the writ should not have been denied is we were never afforded an opportunity to have Mr. James on the stand to find out why he really did what he did. I mean, having just reread the brief with that specific question in mind, I don't see any argument that there should have been an evidentiary hearing on the issue. Well, actually, Your Honor, there is an argument where we're talking about — we're addressing the district court's sort of hypothesized tactical reasons. And we say — we cite several cases from this court which indicate that — which hold that it's inappropriate for a district court to make up reasons what you have to do is grant an evidentiary hearing. And that is — it's in our opening papers. I can get the page number for Your Honor. But you didn't answer the question. Remember what the question was that the judge asked you? Whether it's a subject of the appeal? Yes. Well, Your Honor, I mean, we've appealed from the judgment. And in arguing that the trial court was mistaken, we said you can't — the trial court cannot hypothesize a tactical reason that it did without an evidentiary hearing. Now, did we say the judgment should be reversed because there was no evidentiary hearing? No, we just appealed and said the judgment should be reversed. I don't have access, as you know, I mean, eventually. I don't have access to the full record. So I just have the benefit of whatever excerpts are provided. Did you ask for an evidentiary hearing in the district court? Yes. And it was denied? Yes, Your Honor. It was denied one. On the footing that? I'm sorry? Why? Well, what happened was when the district court entered its order, it simply denied the writ for several reasons, some of them legal. My question was much more targeted. Why did the district court deny — if you made a specific request for an evidentiary hearing and it was denied, did the district court give reasons? And if so, what were they? No. The district court did not give reasons for not granting an evidentiary hearing. What it did was said this claim is meritless, period. Okay. We know, counsel, right up at front, the issues presented. And you have two issues. But refusal to grant a hearing is not one of them. Well, Your Honor, as I said, it was not — it was not specifically — it was not specifically appealed as an issue. But it's briefed — in the brief, we do say that the trial court erred by hypothesizing reasons without giving us a chance to have an evidentiary hearing. Okay. Then let's move on, because I think we know what's shown in the brief. Let's suppose you're correct on the hypothesizing reasons aspect, but that's only half the inquiry. The other half of the inquiry is whether there's prejudice. That's true with respect to the IAC claim, Your Honor. Not true with respect to the conflict claim. And if there's the kind of conflict that you claim, it would be structural error. It would be — prejudice would be presumed. Yes. That's correct. If there is. That's correct. And our position on prejudice — and now I'm just addressing — assuming Your Honor is interested in the IAC issue. I can discuss the presumed prejudice in a moment. But with respect to the IAC issue, this Court has had at least three opportunities to gauge the effect of these kinds of admissions cum confessions on a State judgment. I mean, there's a huge difference between those cases and this one in at least one respect. And that is that in each of them, counsel was ineffective by failing even to investigate. Now, that's not part of this case. I mean, counsel fully knew he was there. I mean, he didn't fail to investigate anything. So the issue is — and in those other cases, there was also a quite clear confession. Here, there's an argument that Solvang was just toying with his investigator, and it's not a clear confession at all, and that it would have — to the extent it was a confession, it just plain cratered your client by putting him there and at the scene. The first point, Your Honor, is the distinction from a failure to investigate. Of course, the effect is exactly the same, which is whether counsel fails to investigate or actually has the evidence. No, it isn't, because then you — in the failure to investigate cases, as, you know, our colleague who writes very colorfully. But, I mean, she was just horrified that anybody who called himself a competent lawyer wouldn't have pursued so that he could make a valid decision. Here, he knew everything there was to be known. He may have known a lot more that may have influenced his decision also, including the fact that your client was ready to turn himself in. How many times did he interview this guy? Several. At least twice, Your Honor. This is why — I mean, there may be good reason to think that the IAC claim is not — may not be terribly persuasive, because, as you say, he investigated. He had the evidence. And if you look at the facts in the record as to how — as to what happened in a trial court, it becomes even more puzzling. Because what happened was counsel went into chambers to put on his immunity motion. He didn't want to do it in open court. And he brought in his investigator into chambers, and he asked him all of these questions about the Solvang interview. Motion is denied. He goes back out in court, puts the investigator on, and he doesn't ask him question one about the Solvang statement. He goes off on something else about Guillory. So that's kind of puzzling. And I think the only explanation — How was he going to get it in? It comes in as a declaration against interest, Your Honor, under the California Code of Evidence. It's a very commonly used exception. But Solvang is not a party to the case. In California, Your Honor, he doesn't have to be a party. He merely has to be unavailable. Right. And under California Evidence Code Section 1230, he was not — he just has to be unavailable and against his interest. But, Your Honor, what's puzzling is — I mean, he clearly has it in mind. As Judge Fletcher said, he's interviewed him a couple times. He just asked him those questions in chambers. What's going on? And there's only one plausible justification, it seems to me, that has been offered that hasn't been refuted by the record, and that's the conflict of interest. It's the only thing that makes sense in this case. If there's no tactical reason, let's look at the conflict of interest that he had. And clearly he had one, because he was the head public defender. He was a counsel of record for Solvang on three cases. You suggest only one possible reason, but there is another possible reason, and that's the guilt of your client. I'm sorry? That's the guilt of your client. That's another possible reason. He knew what the — your client, then his client, told him the whole story. All right? And he knew that this thing by Solvang was a bunch of air. Two responses, Your Honor, first. But to suggest that the only possible reason is the one that you're suggesting is not true. There is another possible reason, and that is that your client was guilty, totally and completely guilty. Your Honor, if that's the case, how do we explain the fact that Mr. James subpoenaed him, got a removal order for Solvang to come, made immunity motions to have this testimony put on? Yep. And at the end of the close of the trial, he brings a motion for a new trial, complaining that the petitioner didn't get a fair trial because they didn't hear from Solvang. You can't square that, it seems to me, with the scenario that you're putting forth. I don't know. I've seen defense attorneys do all kinds of strange things, and I've had hearings about them. And back where I come from, at least, those hearings meant that the defendant waived totally all attorney-client privilege. Same here. Same here, right? All right. Same here. And I've heard things which made my head turn. I used to have blonde, curly hair. Yeah, so did I. But, Your Honor, that's the problem with this case, is that these explanations sort of are suggested, which is perfectly reasonable, because we've never been able to. Okay. Excuse me. I really, I mean, I was real serious when I asked you the question of prejudice. I mean, this is not a slam-dunk case. I'm sorry? This is not a slam-dunk case. I'm struggling with it. And I mean, you have never, you've not yet, and you've got eight minutes left, you've not yet answered my prejudice question. Right, Your Honor. I'm happy to answer it. I mean, it's really an important question. Absolutely it is. And it's an important question for the IAC claim. Unless you're abandoning the IAC claim having to do with deficient performance and are going entirely on conflict. Are you?  It sounds to me like that's pretty much what you're doing. No, I'm suggesting what might be the easiest way for the court to decide the case. Yeah, well, maybe yes and maybe no. Okay. Let me talk about the prejudice then with respect to the IAC claim. The California Supreme, I mean, you know, we can look at Solvang's statement and we can say it's equivocal. Yes. And we can say, he said, maybe. Will you defend me? Richard was an innocent bystander. Why should somebody be punished for something they didn't do? Were you there? Possibly. Did you shoot them? Possibly. And, you know, there is, those statements together appear to be, individually appear to be equivocal. Well, that would be terrific because he goes on, he's not going to testify. So, I mean, he gets his friend off and he gets himself off if he gets immunity. I mean, that's a win-win situation. Or, Your Honor, there's a third possibility, which is that he could be charged with capital murder. I mean, what an offense to toy around with. Three people have been murdered. He's exposing himself by saying, yeah, possibly I shot him, to a death sentence, which is why he carries indicia of reliability. But more importantly, the California Supreme Court looked at these very same statements and said, suggests that Solvang was the killer. And there's a certain ‑‑ There's no, you know, I mean, that's obvious. Of course, he says, well, maybe he, possibly I was there. Possibly I did this. The question is, in view of all of the evidence in the case, including eyewitness saying he did it, he had the motive, his neighbor saw him before he went over there, heard him, heard the mother yell out, no, Richard, no. It was his gun that he went and fired that was connected by ballistic tests to the weapon that was used to kill the three folks. I may be overlooking something, but that's pretty much it. I mean, there was some testimony in there that, at least on the street, Solvang was involved. There is no connection of whatever to give a motive to Solvang to go after the Polos, whereas your client had all the motive in the world. That's just kind of a summary of stuff to start a prejudice inquiry. I understand. As far as the ‑‑ and, you know, we took on each and every one of those things in our briefs. I would say, for example ‑‑ No, I mean, you know, your prejudice analysis was a handful of sentences. No, but, for example, you have these two witnesses. You have Guillory, for example, who says he sees him there. We know that Guillory has some serious problems of his own. He's basically a one‑man crime wave, and he has a series of cases on which Mr. James represented him. His lawyer tells him, let's try and get some action on your cases, Terry, by virtue of your testimony against the petitioner. That goes a long way to explaining what Mr. Guillory's testimony, and we have to take it, actually, Your Honor, piece by piece that way. Ms. Perrone, who heard no Richard, no, was arrested. The largest LSD arrest in the history of the county, 20,000 hits of LSD, and she did no time, and she didn't get any deals. I mean, come on, and, you know, the rest of the piece of evidence, and I see I'm running out of time. I wanted to reserve some, at least so I can get to the conflict issue, because, if I may segue to the conflict issue, if there was the conflict, as we indicate, certainly a concurrent conflict with Mr. Guillory, there's no question about that, and there's no question about the divided loyalties with respect to Mr. Guillory. Because Mr. James' own DA told him, let's get some action based on your testimony against the petitioner. That's a classic conflict. And if we've established that conflict with respect to Guillory, with respect to Solvang, the two most important people in this case, Perrone has other problems. Then it seems to me prejudice has to be presumed, because we don't know why he didn't call Solvang, why he didn't impeach Guillory, why didn't he call Roger Fox, his own DA, and why didn't he call Mr. Perrone? Why didn't he call the attorney to impeach Guillory who says he saw Richard there? Did he get some action on the case? Who knows? He wouldn't call his own deputy for good reason. So, Your Honor, I'm going to reserve the last two and a half minutes, and I'll be back. Thank you. Mr. Howell. May it please the Court, I'd like to try to address the Court's questions with regard to an evidentiary hearing. As I heard counsel say something about a motion for new trial, I believe that that would have been an opportunity for the defendant to have developed a record at that time if this issue was raised. Well, you see, the thing that is a little troubling is that everybody is, sometimes it's real obvious what a strategic reason might be. And so there's really kind of no need to have an evidentiary hearing. Here there is a great deal of hypothesizing, to use Mr. Gibbs's word, about what strategic reasons may have been. And a number occur to me. But that would typically go through an evidentiary hearing before one does it. Well, ordinarily the rule is that the Petitioner has to come forward with some kind of a showing that would indicate that there was not a tactical reason, and under the circumstances, he has not come forward with anything from trial counsel nor from Mr. Fox, who might shed some light on what his relationship was with Mr. Guillory at the outset of this case. And so for that reason, I think the matter fails in its pleading. I do want to go straight to the IAC claim. And I want to point out that the people generally have a right to a reliable adversary process as well as a defendant. And in this particular case, that manifests itself in the hearsay rule under California law. Counsel has proposed that the exception for declarations against interest should have authorized the introduction of Solvang's statement. That's just simply not so. Solvang's statement was not sufficiently incriminatory to warrant the usual inference that supports that exception that a reasonable person wouldn't have said it if it wasn't true. Let's remember that all that Solvang said in response to whether or not he was present and whether or not he had killed the victims was possibly. He says possibly. Maybe yes. That's a pretty incriminating statement, is it not? I read it as nothing more than maybe yes, maybe no. Possibly. And I think it was awfully cagey of him to do so. And it doesn't show the type of mind where someone is so willing to put themselves, to expose themselves to criminal liability that you can infer that it would have been sufficiently reliable to be admitted under the hearsay exception for declarations against interest. It was also inconsistent with his earlier statement. And it had not been repeated either before or since, so far as I know, that he was even possibly the killer. Let's don't forget also that one condition of his testifying was going to be immunity. This is not the kind of expression that one ordinarily finds when someone makes a statement that would be admissible under the declaration of interest type of an exception to the hearsay rule. He's actually bargaining for immunity. And as I believe Judge Reimer put it, this would be a win-win situation. The defendant would get off and so would Solvang. Under the circumstances, he was also like to point out the circumstances surrounding his statement included the fact that he was talking to the defense investigator. It was sort of a boudoir discussion. It was not coming forward to a police officer and then becoming unavailable where once again where the statement would be offered. The statement was not volunteered. It was solicited. There was no other evidence available that indicated that Solvang was present, other than what trial counsel ultimately introduced, that there was some word on the street that Solvang was inside the house, which counsel then used to argue the point that Solvang was involved. And I might point out one other thing, and that is that it's revealed in the record somewhere that Solvang had a deadly disease and that could have influenced him to take the rap for his friend Stewart, the petitioner. He had a motivation to take the rap. That was to help his friend. And that's manifested in various ways. He assisted, an important point, he assisted the defendant in planning the murder and in the suppression of evidence, if you believe his earlier statement to the district attorney's investigator. He also tried to silence Guillory. He wants manifestly to help his friend. And, in fact, in the statement to the defense investigator, he says, and I'm going to try to quote it, I don't want to see Stewart get what they, meaning the district attorney, wants him to get. He wants to help this man. And that's not, that motivation, the vagueness of his response, possibly, and the circumstances of his statement tell you that it would not have been admitted anyway, under the California exception for declarations against interest. Also, it would not have been admissible because, under California law, the Hall case requires that third-party culpability evidence be sufficient to raise a reasonable doubt as to the defendant's guilt. If you took Solvang's statement and introduced it as a whole, I don't believe that anybody would say that I believe he's guilty. This is not chambers. This is not where someone confesses. This was a fellow that was playing real cagey with a defense investigator and fishing for whether he could get immunity and also get his friend off. Now, there's a point here at which I have to bring in the fact that counsel raises ineffective assistance as being evidence that trial counsel had a debilitating conflict. That's not the case here. Trial counsel, it appears to us, was acting tactically when he first tried to get Solvang to exonerate his client, and then later on, when Solvang took the Fifth, there's no evidence that the trial counsel urged him to take the Fifth Amendment. This is not a situation where counsel is trying to prevent some kind of situation where the conflict would become a problem for him. In fact, I think counsel probably realized in his heart that whatever Solvang told Investigator Rock, the defense investigator, would have actually harmed Appellant's case. I frankly don't think he really wanted that statement in evidence at all. He was trying to infuse the record with an appellate issue that the fact that, I mean, the identification defense that the defendant presented, it would have put him at the scene at the time of the killing and made him guilty at least as an aider and a better. It would have bolstered the credibility of the prosecution's witnesses who identified the defendant as being present at the time. It would have opened the door to the introduction of Solvang's earlier statement to the DA's investigator, a fellow named Shostrand, under evidence code sections 356, which means we get the earlier statement as well. And I want to point out that that section is not limited to a single statement. It can incorporate earlier statements as well. And it doesn't matter whether or not the declarant is actually present in court. So you can have a statement which causes the introduction of an earlier statement under California law, whether or not that declarant is there to describe either statement or to review them or explain. The earlier statement would also have been admissible under the prior inconsistent statement exception. And these would have been just absolutely devastating to the defense, because Solvang had sat down in his earlier statement, he recounted how he had sat down with the defendant, and they planned out the murder, planned out how to suppress the evidence. I believe Solvang even suggested how to burn the house down. So maybe Solvang was involved, but clearly that first statement would have shown that the defendant acted out on Solvang's suggestions. In any event, Solvang's statements would have been of no benefit to the petitioner in this case. So we come to the Court's questions about prejudice. There is no prejudice to the defendant resulting from the conduct of the trial counsel in this case. First, the statements were not admissible, as I've already explained. As a practical matter, there's no reasonable likelihood the jury would have believed the defendant was present at the scene, as Solvang said in his statement, but was just merely a witness. The defendant clearly had motive. There were letters in which he had written from jail explaining how he was so upset that his parents had, on a previous occasion, caused him to go to jail. There was a testimony of the next-door neighbors, Powell and Perrin, that the defendant was very animated and he was expressing displeasure over his parents, his mother and his stepfather. And then we have the two witnesses. One of the next-door neighbors hears the statement, No, Richard, no, screamed by the victim to her son at the time of the shooting, as it comes between shots. And then the statement by the across-the-street neighbor, Guillory, who says, I looked over and I saw the appellant looking at me from the house where the killings had just occurred, and he looks in my direction and then he says, Oh, shit, because the inference being he saw someone who had observed him there. So we've got the two witnesses that placed him there. We have the evidence regarding the stolen weapon, which was later seen test-fired, the ballistics comparison, the evidence of consciousness of guilt where the defendant failed to attend his mother's funeral. He called his cousin, Gary Beach, and asked him to lie about the caliber of the weapon that Beach had seen Petitioner test-firing. And then we've got all this business about Petitioner arranging to have Guillory silenced in some fashion by the transfer of $1,000 or so to Solvang. Finally, in terms of prejudice, any prejudice that may have resulted by the omission of this or the omission of this evidence involving Solvang's statement was allayed by the fact that the Defense Council introduced evidence that on the street there was word that Solvang was inside the house. And then, of course, the trial counsel used that statement in argument to say that Solvang was involved in the case. So the point is that there was no prejudice. Under the conflict of interest theory, the idea of prejudice is somewhat reduced for finding that the conflict was caused for reversal. All that needs to be shown in order to establish such a claim is that there was an adverse effect. Well, in this case, again, I'll go fairly quickly. I'm skipping over the fact that Mr. James did not actively represent either Solvang or Guillory. And I suppose I should mention also that there's no United States Supreme Court authority that would impute a conflict to a public defender just because someone else in his office had acted on behalf of a prosecution witness. Another point I'd like to make, and that is that it's unclear from the record when Mr. James became the public defender, so it's inaccurate to state that he was actually counsel of record for Solvang at some remote, during some remote case. He may not have even been in the office at that point. But anyway, let me turn now to the adverse effect. There was none, either at the preliminary examination or at the trial. At the trial in particular, Mr. James cross-examined Guillory comprehensively, attacked his credibility, brought out that Guillory was in custody and was going back to court, that he had received no promises of leniency for his testimony. Mr. James could have called Mr. Fox to testify more as to whether or not he had sought leniency for the defendant. But, I'm sorry, for Guillory. But, in fact, the record fails to show how defense counsel could have done what he would have gained by that. And, frankly, I think that there's a pleading requirement before we ever get to that point and consider whether or not that should be the subject of an evidentiary hearing. I don't believe that there was ever any showing that Fox would have anything to add on this point. With respect to Solvang, there was no adverse effect as a result of any supposed conflict. Solvang himself chose to take the Fifth Amendment, so there was nothing Mr. James could do about that. His statements were excludable as a matter of law. His statements were harmful to the defendant, would have been had they been introduced, because it would have shown presence and corroborated the prosecution witnesses. The fact that Solvang said he was possibly the killer was practically worthless to show third-party culpability, and these statements could have opened the door to even more damaging statements by Solvang. The final point I'd like to make is that Petitioner has the burden to show not only an adverse effect, but he has the burden to show that an actual conflict, or, in other words, active representation, caused that adverse effect. And here, defense counsel, Mr. James' conduct was explicable as a reasonable tactical choice. Consequently, Petitioner cannot carry his burden of proof of showing that any adverse effect was caused by some form of conflict. And for that proposition, I've cited in our brief at page 49, Berger v. Kemp, a Ninth Circuit case called Bragg v. Galazza, and two other cases, Maiden v. Nodal. So unless the Court has any further questions, I have nothing further. Okay. Thank you, Mr. Howell. Mr. Gibbs. Thank you, Your Honor. So you see my problem. We have three more tactical reasons that were just suggested by the Attorney General, which, again, are hypothetical, and we don't know whether they were in Mr. James' — well, we know they were not within Mr. James' contemplation because, as I said, he was still complaining about this right up until the end of the motion for a new trial. Your Honor, it seems to me that with respect to the need for an evidentiary hearing, it's virtually impossible for anybody to know exactly what happened without that evidentiary hearing. And I would direct the Court to a recent decision in a case called Bernie v. McDaniel, which is, of course, a habeas case, where the Court, with this Court, indicated that an evidentiary hearing, that the issue of whether counsel had a tactical reason for engaging in particular conduct or whether it was influenced by a conflict of interest, that that could not be decided from the state of the record, therefore, we will remand it for an evidentiary hearing. And that's precisely what's happening here. We can't tell what happened. And so with this record in the state that it is, without being able to support the district court judgments on this record, it should be remanded as an Alberni for an evidentiary hearing to find out exactly what happened. And if, lo and behold, we find out that Mr. James didn't put that on because Solvang was a former client, and under the California rules of professional responsibility at that time, rule 4-100, you cannot take an adverse position with respect to a former client, if, lo and behold, that were to happen, this case would be in a very different posture. But we don't know. We don't know without that evidentiary hearing. And so at a minimum, Your Honor, we would be asking the Court to grant an evidentiary hearing so that we can get that essential evidence in. And it's pages 28 and 29 of our opening brief. We explain that the district court's decision should be reversed because it made reasons up without an evidentiary hearing. Further questions, I would submit it. Okay. Thank you, Mr. Gibbs. Thank you, Your Honor. Thank you. Counsel, and the matter just argued will be submitted and the Court will stand and recess for the day. All rise. I'll let you get by it and then you can lean on my chair. Thank you, Your Honor.
judges: Fletcher, Rymer, Duffy